It turned out to be not an eyewitness at all. A two jailhouse informants would have a good track record of informing and basically the information they gave at the time that they gave it, or that they say that they got from the from the defendant was well known throughout the jail and throughout the media. It was basically just information that anyone would have known, certainly anyone in the jail. And the Jackson standard is very low for sufficiency of the evidence. So we have to take all the evidence in the light most favorable for the prosecution, whether any reasonable juror could have been on for the prosecution. And then we have the Edpas standard on top of that. So we have to say that state court was unreasonable in holding that the evidence was insufficient. So the problem I have was given that Josh Burroughs prior inconsistency came in, why couldn't a reasonable juror have credited them rather than his his testimony on the stand? Well, for the most part, because he redacted under under oath, given testimony in front of the court. And that certainly is certainly more significant than what he told in interviews with police officers, which we know there are certain things that are allowed by police officers and things that are done in interviews. So are you saying that no reasonable juror could have failed to credit what he said on the stand as opposed to what the police officers said? Correct, because he basically at the preliminary and in the trial said on the stand that everything he had said was untrue. And interestingly enough, he said that the reason that it came about was that he was afraid of being attacked for being a snitch. And in fact, at that point, when he was talking to the police officers, that's what he was doing was snitching in the trial. Of course, it's otherwise. And in California law, prior inconsistent statements can come in as substantive proof. But my point is the fact that what's being done here is that is that. All the value of testimony and cross examination and everything is being just cast aside and saying that this this trumps it. Why do you say that? Because it seems to me that's the opposite. You're asking us to say we have to, as a matter of law, discredit this testimony. Any time that there is somebody who recants, which is fairly often, really, that we have to throw out their entire testimony. Why isn't it a job for the jury? We didn't see the witness. We didn't form an opinion based on his demeanor about whether he was telling the truth. The trial. We can't. But the issue here isn't really what his testimony was. I mean, that's not being tested. There's this statements that are made to police officers in an interview that are being adopted that didn't have anything to do with the testimony. Well, true. But I mean, in a sense, because you're arguing sufficiency of the evidence. We presume it all comes in at this point. I know you have other arguments, but if we presume that it's all properly vetted, why? Why shouldn't the jury be able to decide between prior inconsistent statements and the statements on the stand? And it seems to me, just to continue for a minute, if you'll hear me, is, you know, we do get we do get a lot of cases in which witnesses change their testimony. It seems to me that if we're saying under Jackson, as a matter of law, we've got to reverse that. That's it's going to cut a pretty wide swath. Well, it's not a very wide swath here, because what it affects is he ends up saying that he wasn't there. It wasn't an eyewitness. He left before this even took place before the murder and rape took place. Let me turn to Brady for a second. I had a couple of questions on that. I wasn't clear from the record, and it may be obvious, and I'm just not seeing it. Were there any documents about the prior statements? In other words, were these recorded statements? Were there police witness statements about what the witness said before the preliminary examination? No, I didn't have police statements. So it was just the fact that everyone admitted that he told the police he'd lied, that that wasn't disclosed. Is that it? In other words, the Brady argument starts because before the preliminary examination, it wasn't disclosed that he, in fact, told the police I was lying before. You know, in terms of Brady material, you think, well, is there a written statement? Is there a transcript? Is there something we're not seeing? And I didn't see any of that, so I assumed, and I just wanted to make sure I was assuming correctly, that all we had was the contemporaneous disclosure at the preliminary examination that, in fact, he told the police he had been lying, and then at that point everybody knew. Is that what we have? So if that's the case, what else did you need before trial? Well, as I say in my brief, the only thing I believe is, and the sufficiency of that can be a different point, but it certainly affects how you plan for the preliminary and what you're working on and what you're investigating and to find out that everything that they've been building is just gone. So your Brady claim is basically directed to the preliminary examination and the prejudice there rather than a trial. Correct. I'm saying that the preliminary is part of the contesting thing as opposed to a guilty plea situation where you aren't contesting anymore and so the argument is not valid. Let me quickly take you to the next step because I know my colleagues have some other questions. Let's assume that there's Brady error because it wasn't disclosed at a critical proceeding, which was a preliminary examination. All right, just assume that there is Brady error. Why is it material? I think it was disclosed at the preliminary. Right, right, before. If I said at, I meant it should have been disclosed before. So I'm assuming that there's Brady error that affected a critical part of the proceeding, which is a preliminary examination. Why should we hold that it's material if you had the same information at trial and can cross-examine on it? Well, again, just in terms of preparation and what your whole approach and what was going on prior to the start of the preliminary hearing. I understand that, but now we're past that into trial. You have the material. Was there anything that they, you don't claim here that there's anything they didn't disclose pre-trial after the preliminary examination. Okay. All right. As far as the informants are concerned. Again, each of them, I believe, had three prior cooperation situations. I believe one of them even had made an agreement before going into jail about making special circumstance situations. And in terms of Mr. Hopkins, it turns out that he said that the information was given to him when they were working together on a work assignment. And it turns out that they never worked together. So it seems to me that that makes it impossible, by definition, for his testimony as to what he was told by the defendant was actually, it actually occurred. In other words, it was not possible. And that's the test, actually. It's possible that they talked at some other time. But that's nowhere in the record. It was part of the cross-examination, wasn't it, that brought us back. There was some preparation there. The cross-examination included the fact that they never worked together, right? Correct. I believe he also came up with another time that he thought, he named some area where they smoked or something that could have been at that time. So you're saying, so obviously that's a credibility issue for the jury. And so a reasonable jury, you're saying, couldn't credit them. But even, is that just to say there is no evidence there? So discounting Burroughs' testimony, and then the other informants are equally not credible, so that the jury didn't have any credible evidence left, is that your argument? Yes. And certainly any other evidence came in would be very tainted by that whole process. Could I ask about Officer Erb? Is that how you say it? I think your argument there was that there was prosecutorial misconduct. But is there anything that indicates that the prosecutor or Officer Erb himself were lying? Officer Erb said he was surprised. Yes. He says he was surprised. And do we have any reason to believe that at that point in time, the officer was lying about being surprised, or the prosecutor knew he was lying about being surprised? No, the point there, I believe, Your Honor, is that he was being misleading. And he was certainly aware that he was being misleading. And it was a very important piece of evidence. So how do we know that he was being misleading and the prosecutor intended him to be misleading, as opposed to just mistaken about what was going on? Because why else would he even bring up that issue? No, he may have brought up the issue because he thought it was true. Officer Erb may have been surprised. It's possible that Officer Erb didn't read the newspaper. It's also possible that Mr. Lopes didn't read the newspaper. Right? It's possible. There's also the discussion that was going on all throughout the jail through this whole period. After Officer Erb testified that he was surprised, and I think your response to that is that was misleading because this information was already out there in the public. No, it was that the point was that they were trying to show at that point that Mr. Lopes had to have been there to know that these two articles were missing. That I understand. Officer Erb testified he was surprised. Mr. Lopes wouldn't have known that. The implication was he wouldn't have known that unless he was there. But there was this newspaper article out there, right? Isn't that your argument? The newspaper article, TV, everything was out there in the media, but there was a headline in the newspaper about the missing. So was there some cross-examination then that said, Officer Erb, wasn't this all over the newspaper? No, I don't know. Not that I'm aware of. Well then, I mean, if everybody knew what was going on and this was also misleading, then why? If everybody knew that this was in the newspaper, how come there wasn't that cross-examination? I'm just saying the evidence of this being misleading purposely for prosecutorial misconduct is kind of weak. Well, the other thing is that I noticed that the officer said that he was so surprised that he didn't have any writing paper with him, so he wrote it on the back of the booking sheet, which isn't there. What I'm saying is he may have been unintentionally misleading because he was ill-informed. Just quickly, and I probably just missed it, but I didn't see where Lopes raised this Officer Erb claim, this prosecutorial misconduct claim to the State court. So I was concerned about exhaustion. Can you just point me to where in the record? That's the one issue I think they pointed out, that it may not have been exhausted, and then they went on in their brief, I believe, to say I have the merits. Right, but where was it exhausted? I'm not so certain that it was exhausted. Okay. All right. Thank you, Your Honor. Thank you. We'll give you some rebuttals. May it please the Court. Tammy Crenson, Deputy Attorney General for the Warden Campbell. I just want to briefly address the points that opposing counsel has mentioned. First of all, the sufficiency of the evidence. It was clear it was a credibility determination on the witnesses, and, of course, it's very clear from the record that Josh Burroughs had some credibility issues as well as the jailhouse foreman, and that was fully explored by the defense at trial. I think what's most striking about Josh Burroughs' testimony or statement about the murder and rape was the fact that he divulged that information when he was at the victim's grave site after asking to go there, and everything he described was consistent with the details of the crime, down to where the victim was. He was able to point out where the victim was located within three feet of where her body was found, as well as the state of her clothing when it happened, as well as describing the strangulation methods and the beating that were all consistent with the injuries that the coroner's report showed. And so the jury had this, and when you look at those details, and as Detective Souza said, that he doesn't know how this individual could have known all these details without having witnessed the crime. And although there's claims that this was all over the media, there's nothing in the record that shows what was actually revealed to the media. Detective Souza was surprised that this witness knew the details, which seems to indicate there wasn't a lot of the details weren't divulged, as well as Detective Morgan testifying that the media was not at the scene when the crime happened, and they were not allowed to take pictures inside. So the fact that this witness was able to describe all these things certainly gave a jury, a jury could certainly believe this testimony. It's actually the credibility of Officer Souza that's the key here, right? Well, he's the one who's testifying as to these prior inconsistent statements of Burroughs, right? Well, actually, Josh Burroughs testified as to, his statement changed every time. I mean, he said he was cross-examined at trial about his inconsistent statements. So that was fully explored, and that was an issue, again, for the jury to decide. So Souza said he said this, and he said, I said it, but I was lying. But I was lying at the time. And certainly there's also... Didn't he also say he was led by police? He was telling them what they wanted to hear, that they said this, and he agreed with them? He did indicate that he had, first of all, some fear of being snitched, which wasn't entirely consistent with the fact that he snitched. But he also was... It was pretty obvious, too, he was afraid of being implicated because of the fact that he witnessed this, and he said early on he was afraid of the police, his involvement. So there was a full explanation of that, and the jury was able to make that assessment. But along with his testimony were the jailhouse informants, who also knew details down to that the victim had a bladder infection, and there were some very specific details that those jailhouse informants knew. And again, those were credibility issues for the jury to decide. Their inconsistencies and their criminal records were fully explored. But I also want to mention Mr. Lope's incriminating statements, and there were a couple made to Officer Erb, which will take us into one of the other arguments. But he said, he brought up on his own, what do you think Jake did with the backpack and shoes, and then said, I bet he burned them. And then he also said, I bet the victim was unconscious when she was killed. Now, certainly those aren't admissions, but they're strikingly odd and troubling comments to make during an interview, and the jury did hear that, as well as the jury heard that there were hairs taken from the scene, and one, although not conclusive and exclusive to Mr. Lope's, one was consistent with his pubic hairs. I thought the whole, well he's arguing that the Officer Erb thing was just purposely misleading, because these details were in the paper. And that's the prosecutorial misconduct, I guess, being purposely misleading. Well, first of all,  I went through the transcripts, trying to find out what the media had divulged at that time. And other than the Detective Morgan saying that reporters weren't allowed at the scene to come in, and that Sousa was troubled by the fact, or believed Josh Burroughs because he didn't know how else he could know those facts. We don't have on the record what was revealed to the media. What about that newspaper article? The newspaper article? The one that was attached to the habeas petition, that talked about the backpack. Well, there was indication that the backpack, apparently because the mother had talked about she always had her backpack, and it was missing. And I was going to get to the point that even if that was clear, all he said was that he was taken back by it. The fact that Mr. Lope actually brought that up, and then I think also looking at the second statement, where he said, I bet he burned them. I mean, that statement alone could take the officer back. And so all he said he was troubled by, or not troubled, he was taken back by it. He didn't say anything about he couldn't have known these facts. It was an argument of the prosecutor at closing, wasn't it, that how could he have known those things? Wasn't that part of the post-mortem? Actually, not as to Officer Erb's statements. Not that I looked, I read the closing arguments. But you were talking about Burroughs. How could Burroughs have known, and that comes through Erb's. But Burroughs didn't mention anything about the backpack and the shoes. And Burroughs was relating to the physical evidence, and there were a lot of details of that that were apparently not released to the media. And I don't know, because we don't have all the articles that the media released, but certainly in most investigations, all the details are not released. And even Josh Burroughs said, when he first said, I learned these facts from the media, he clarified himself and said, well, I heard rumors about the strangulation with the bra, and then the media that she was dumb. So even he backed off the statement that he heard everything from the media. But, again, those were credibility issues for the jury to decide with that. And back to the prosecutorial misconduct, first we assert that that wasn't exhausted. But beyond that, it's not a culpable claim, because there was nothing false about that testimony, and there was nothing misleading. All he said was, I was taken aback. And it certainly is troubling to hear an individual not only ask about those items, but say, I bet he burned them. The jury asked to have Officer Erb's testimony. That was the last thing they asked for before they deliberated. Sure, and Officer Erb's testimony also included that he said, I bet she was unconscious when she was killed. In a point, like somewhat an exhaustion argument, when that article was attached to the Hades Corpus petition, was it attached to some argument in the petition? Not that I'm aware of. The problem was that Mr. Lopes was pro se, and his petition was fairly convoluted. And we did not construe that as a separate claim for prosecutorial misconduct, other than just him claiming evidence was coming in that shouldn't have come in. Although he did make allegations, but it was couched with some other allegations. So that's why we didn't respond with the district court with that defense, but the district court construed it as a separate claim. But even so, even if the court, if this court deems it exhausted, and that we've waived that defense, the claim can be rejected on the merits. Let me turn to the Brady claim for a second. I just want to get to it before it runs out. We've been sort of talking about the trial, but there is a pretty good argument, and the California courts have adopted that argument, that Brady applies to the preliminary examination as well as trial. That there's an obligation to provide Brady material prior to the preliminary examination. Do you disagree with that? People v. Jenkins, I think, is the case, the primary case in California. Well, I'm not going to disagree with California law, but as far as how it affects the federal claim, there's no clearly established right that Brady applies before a trial. All right. So let me ask you for a second. I think under Collin v. Alabama, I mean, the argument would be under Collin v. Alabama, that the preliminary examination is a critical part of the trial, and that it is a probable cause. I mean, it may result in the termination of the case, if probable cause isn't found. And, therefore, Brady should apply prior to the preliminary examination. I mean, that's the argument. Leaving aside all of Ed Pahn and all that stuff, why doesn't that argument work if we're hearing it for the first instance? Well, it certainly doesn't work on the facts of this case, because you would No, I'm just talking about the abstract. I'll get down to this case in a second. Well, but the information was disclosed at the preliminary hearing. No, I'm talking about before. And the reason I say that is because I think defense counsel is quite correct. It affects your entire approach at the preliminary examination if you have the material ahead of time. If you don't, you're going on these statements. And here we have, getting down to this case, a witness who is recanting, and he's the key witness. A jailhouse informant testimony alone is rarely enough to convict. So this is the key witness. He's recanted his testimony. Why shouldn't that have been disclosed before the preliminary examination? Well, I think when you look at United States v. Ruiz, the Supreme Court has held that Brady doesn't attach to a guilty plea. And I don't know how that would be any more prejudicial at a preliminary hearing than a guilty plea, because certainly a defendant needs to know what evidence there is against him, because whether he actually did it or not, he may still plea based on the evidence against him. So with the Supreme Court's ruling there, I don't see how this could be considered any more of a critical stage. Well, that's the interesting thing is that California law seems to, and citing Brady, says it is a critical stage, and you've got to disclose what you have to know. Let's assume that there's Brady error for the second, and I know you disagree with that for a variety of reasons. Where do we judge materiality? Is materiality judged at the preliminary examination stage if there's Brady error or at the trial? Well, it would certainly, wherever the Brady error attaches, it would be determined there. So, I mean, that seems logical to me, that if a preliminary examination is a critical part, Brady is required prior to that, then we judge materiality at the time of the preliminary examination. And under that analysis, the question would be, was there a probable cause anyway? Would that be the analysis you think we'd have? Sure. What I think is important to look at here is the evidence that actually came out at the preliminary hearing was favorable to the stories that were, the first story was favorable to the defendant. The second story at the grave site wasn't. And then at the preliminary hearing, the witness basically said, I didn't witness anything. I just saw the two, Jake Silva and Ty Eric Lopes, in front of the Home Depot, and then I left. So, I don't see where the prejudice is here. It reinforces, I understand your argument. I'm just kind of piecing it together through the lens of the examination. I guess my final question, I don't want to take anybody else's time, is this. Let's assume there's Brady error in this material, the preliminary examination. Then do we do an additional analysis on harmlessness and review that through the trial lens, or not? Well, part of a Brady error, the third step is resulting prejudice. So, you look at the resulting prejudice. With Brady error, I don't believe we do harmless error analysis. I believe that that's, if there's Brady error, then it's a constitutional violation. Right. So, but you look at the resulting prejudice with a Brady analysis, and so there has to be prejudice here. And there certainly was no prejudice for information that was discovered at the preliminary hearing, and the information that was favorable to the defense. And they were able to use that. They talk about not being able to impeach him, but I'm not sure what they needed to impeach at that point, particularly when he had already given two, they knew of two inconsistent statements prior to that. Okay. I don't want to take any more of my colleagues' time and questions. Go ahead. And unless there are any further questions, we'll submit. Okay. Thank you. Briefly, initially, as far as Mr. Burroughs, knowing some of the things about the property and about where things took place, he was there earlier. We know that his testimony is that the only thing to change is whether he was there when the murder was committed. And that's the crucial point. I agree with the statement that rather than being possibly rather than being afraid of being a snitch, that part of what transpired with the interrogations with the police had to do with his own fear of being implicated. And that should be considered as far as the information on the missing shoes and backpack. As you indicated, it it it wasn't. It was a newspaper headline is what it was. And it said that the missing that the backpack and the shoes were missing. Also, as far as physical evidence, what was argued was that was that these witness testimonies were corroborated by the physical evidence. And that's also not the case because there's information there that the expert testified that there wasn't showing him. There wasn't evidence of sexual contact close in time to the murder and things like that. And then also the other thing is that because it's been covered covered thoroughly, there is a difference between a guilty plea and a preliminary hearing in terms of analyzing the Brady situation. Thank you, counsel. Thank you. The case has heard will be submitted for decision. Thank you both for your arguments. And we'll proceed with the last case on this morning's oral argument calendar, which is Rose versus progressive casualty. Sure.  May it please the court. Brandon McKelvey, on behalf of Progressive Casualty Insurance, the appellant. I'd like to reserve five minutes. This court should reverse the remand order because the district court refused to consider dispositive evidence when determining what progressive established the amount of controversy under CAFA. The evidence the district court ignored was plaintiff's binding judicial admission that they and the fugitive class members worked two to five hours of unpaid overtime in a typical work week. This admission, when read in the context of plaintiff's allegations in their original complaint, established conclusively that the amount of controversy far exceeded the $5 million required under CAFA. Had the district court considered this piece of evidence, the only possible conclusion was that progressive met its burden of establishing the amount of controversy and that the removal was proper. There are three reasons the court's remand order should be reversed. The first is that the district court made an error of law by not considering plaintiff's post-removal admissions. The second is that progressive met its burden of establishing the amount of controversy. And third, this court can provide effective relief by reversing the remand order, which would essentially supersede the second remand order, and therefore this appeal is not moved as plaintiff has suggested. Can I ask you to address this issue? I'm really struggling with that question because it seems to me now that a federal court, district court, has ordered the case remanded. The progressive hasn't appealed yet. And so why, under what principle of law would any relief we gave you on the first issue, the first remand, undo or unwind or vacate that second one? So why isn't the second one the operative remand now? Because removal is determined based on the original complaint. And even though that there's been proceedings that have happened after, the question on mootness is whether or not this court can provide relief. And the answer to that question is clear. The court clearly can't. We can on your first one, but that one is superseded. This is what I'm sort of tussling about because the state court had jurisdiction. The case was in the state court, you know, on remand. There was another removal order, remanded again. So there's an order based on a different proceeding in the state court, remanded. So there you are. I mean, I'm just not sure what relief on the first remand order does to the second remand order. Maybe you can sort of spell it out, and if you could name names of cases, that would help. Right. The first remand order, if it's reversed, would supersede and wipe out the second remand order. Okay. Under what principle of law? What case are we looking at here? Just the general principle that it's well settled that the court has authority to order any appropriate and effective relief upon the disposition of an appeal. That's a general, and I'm sorry, I don't have a case for that. I could further brief it. No, I think we accept that. But the really odd part on mootness here is let's assume that we some time had intervened and there had been a trial in state court, tried the judgment, and this appeal comes up here, and we say, yeah, it shouldn't have been remanded. Does that vitiate the trial? Well, again, I mean, that question isn't before you. I understand. We're just trying to carry out the logical conclusion. Right. Well, and it wouldn't in this context because we're talking about a CAFA remand, and in a CAFA remand, we're talking about 28 U.S.C. 1453, which gives us a 60-day turnaround. To be honest with you, Your Honors, we thought the judge, when he took the matter under submission, was taking it under submission and going to stay and wait for the appellate court to rule. It's a surprise to us that he then turned around and issued an order creating this situation. Well, maybe he's trying to avoid us deciding the case. But the thing is that that's not possible. And the reason that's not possible Well, it may or may not be. But that's where we get to moot and decide. Right. Aside from our general appellate powers, is there a case that you can cite to us that we have the power to? That's not moot? The cases that we rely on in our briefing was what I would cite to you, and I don't have them written here in front of me. But those address the mootness. The question under mootness is whether or not the court can provide effective relief. And there's no reason here that the court can't simply, by reversing the first remand order, put us back in the original position, which is in federal court. There's no reason that can't occur. We would say, I mean, what would the order say? The order would say that you would have us give that the second remand order is vacated, although not appealed, but vacated persons who are inherent authority. Is that what you're looking at? Yes. Exactly. Once the, if jurisdiction was proper on that first removal, then jurisdiction was established. At that point in time. And if you decide that jurisdiction was established at that point in time, then it doesn't matter what happened after that. And it would unnecessarily tie this appellate court's hands if you said, no, well, we can't do anything because then the district court, that would mean the district court order can essentially tie the hands of the appellate court in this situation, which is not the case. Well, you didn't ask for a stay in the preceding state court. And then. And there's a reason. And then you removed again. And then you didn't appeal the remand order. It seemed like there were many places where you could have raised the issue about the, or prevented us from being in this situation. Right. And let me address that. There's three reasons why we did not request a stay and why we really couldn't request a stay. The first is that we're not required to seek a stay under 28 U.S.C. 1453, which conditions the right to appeal on a timely filing without mention of a stay. And there's actually a case on that, which wasn't cited in our papers. It's a state of Pew versus Cardarelli 527 F3D 2528. The second circuit decided in that case that not having a stay issue between. But then you went ahead and got another order based on the amended complaint. Which was the unfortunate. Well, that was the, no, that was the unfortunate position we were in because the court's order that gives you an idea that there's a removal jurisdiction. You have to remove it. Well, as soon as the, we received the court's order granting remand in his order, he said, I'm not considering the first amended complaint. And I'm removing this case. As soon as he said that, and the first amended complaint had not been considered, then all of a sudden the operative pleading was the first amended complaint that went back to state court. And now all of a sudden we have a court order that's telling us, I didn't consider the first amended complaint. But on the second one, he considers the complaint that you say establishes that it's over the jurisdictional amount, triggers the cop-out rule. But the court said, no, I disagree. I don't read it that way. But you didn't appeal that ruling. It's under an entirely different standard. What difference does that make for purposes of moving the case forward and ensuring that that order is no longer operative? Again, there was no way for us to issue a stay. We had to re-remove. That was the only procedure available to us because we were put on notice. And at that point, the issue is whether or not the second remand order, the district court's second remand order, can somehow move this appeal. And the case law that we cited in our brief, and the general jurisprudence rules here, is that a district court cannot divest the appellate court of jurisdiction by a subsequent order. They can't do it. It's not possible. Let me turn for a second. I understand you're going to overtime pay. Is there an issue on attorney's fees going over the statutory amount? Attorney's fees can be considered. How should we consider it in this instance? We presented a variety of evidence that the amount of controversy far exceeded $5 million. And our argument was that even without the attorney's fees, if it's considered, a typical attorney's fee award in these types of cases is a common fund in the class action of 45%, meaning even if we're talking about north of $4 million, we then get over the $5 million jurisdiction limit. Okay. I think we have your argument at hand. Do you want to save some time for a moment? Yes. All right. Thank you. Thank you, Your Honor. This is Jason Hill on behalf of the Fiatelli plaintiffs. May it please the Court, I think the Court has hit upon exactly the precarious nature of where we are with the subsequent remand order. My real question is, had Judge Burell denied our second remand, would we be here? And if we wouldn't be here, then why are we here now on this appeal when he's now considered all of the things that counsel, one, considered the first time and has one by one found the items to be insufficient to invoke K for jurisdiction? So that's my question about the mootness. I believe that as a matter of procedure, in order for the defendant to have pursued what it wanted, it would have had to have at least stayed the second remand. Even if it felt it had to remove, it would have needed to stay to preserve its ability to get any appellate remedy under the old case number. But wasn't it sort of in a catch-22 that was sketched out by opposing counsel? It didn't have, it had no obligation to stay the proceedings in state court. The appeal would continue. But then at the point where the complaint is amended, it sees that it triggers the jurisdictional amount, it did have to bring another removal order or it would lose that right. Wasn't that a catch-22 for the President? I don't believe so because that's what I'm saying. I think that if they felt that was necessary, that as soon as we were assigned a new case number, they should have said, well, let's hold the brakes now on this until we want to perfect our appeal. Well, I don't understand how the State plays into it, frankly, because, and state court, I'm talking about, because you've got an absolute 30 days. They've got to take action in 30 days. It doesn't matter whether it stayed or not. Let's say that there's a stay order in effect. They still have to make that second removal. I mean, I don't see how they get around that. Why is a stay relevant at all? Well, I'm talking about not a stay in state court. I'm talking about doing a removal petition, a second removal, and then moving immediately for a stay with Judge Burell, who ultimately was assigned a new case, so that they would preserve this appeal. But they didn't do it. They didn't do it. They pursued both remedies at the same time, which I think is not very prudent. I don't know. It seems to me that they weren't faced with many good options. I mean, in a sense, you had a district court pull the trigger a second time. And, you know, I think personally that it may be difficult to reach that, but it would be odd for us to lose jurisdiction over the first appeal if you took subsequent action to try to move it. My thought on that, Your Honors, is that in order for them to have perfected the strategy they were effectuating, they would have had to have petitioned and consolidated a new petition for appeal of the second remand order and tried to consolidate it together so that that could be properly subject to review. Right now, I do not believe that that second order is in any way, shape, or form properly subject to any appellate review. So let's get to the merits of the first one. I understand your mood in this argument. Why shouldn't we consider overtime pay? Well, in what Judge Burrell did. I'm going to back off, and I look fairly at your complaint. I've looked fairly at these things, and I say this is over $5 million in the real world. You're not going to ask for $100 worth of attorney's fees. You're going to ask for attorney's fees that exceed in the normal case. If you get what you ask for in state court, you're going to exceed the $5 million. The overtime calculation seems reasonable to me. It seems to me that we're way over $5 million in what you're actually seeking. So what's wrong with that? I think that as to the merits of the order, as to the attorney's fees, number one, as to the amount, I mean, that's completely speculative, that we ever receive a dime in attorney's fees. No, but you count that as potential or what you're seeking. There is a potential. Of course, it's speculative of the $5 million. You don't know what you're going to get on this case. The question is the jurisdictional amount. The thing that I have an issue with, and I think where Judge Burell hit it right on the head was, at the initial time of removal, he has to look, is there evidence? What are the allegations in those pleadings? And I think that under the case law, the basis of his decision was exactly right. On purely technical procedural rules of removal, did Progressive submit any evidence, even under the Abrego or the Sanchez standard, to satisfy its burden to invoke CAFA in the first instance? And I think that in that regard, his order is spot on. What he then did is said, well, if I follow what the defendant urged me to do, they told me I couldn't consider the First Amendment complaint, but I could consider the Declaration of Kadesh. So that's what he did. The problem is that the Declaration of Kadesh and no other subsequent evidence that was filed in any way put in issue an amount for overtime. So they come up with this idea, well, we'll look and pick through the First Amendment complaint as a judicial admission, and we'll use that as our evidence. And I think that that's what Judge Burrell said is, no, you told me I couldn't look at that. You told me to disregard the First Amendment complaint. You just want me to consider your subsequently filed evidence. I think for— I mean, in our circuit, isn't a complaint and other pleadings considered judicial admissions? Why couldn't the judge correctly look at that? Why was it then an error to say I can't look at that for purposes of an admission about what's at stake? The authorities that the court relied upon in this order actually are very clear about the court need not consider that subsequent evidence or admissions or allegations or the subsequent Declaration of Kadesh. And I think Judge Burrell was just trying to crystallize it as a process for district court judges. Hey, if it doesn't come in exactly as it needs to be the first time and absent a request for some sort of CAFA threshold discovery, which there was none, then I'm sending it back. Simple analysis. There was no evidence with the petition. The complaint had no damages allegation, no overtime, no anything. And he just followed the law. And in fact, in the rapporteur's transcript, both sides were dancing around because I wanted, of course, to consider the subsequent disclaimer of CAFA jurisdiction. And the defendant wanted to consider the two to five hour estimate for my clients as to unpaid overtime. And the judge just threw his hands up and said, there's no need for me to get there. And if I do what the defendant wants me to do, I can't consider the two to five hours overtime. It's not in evidence. They just want me to consider their late filed evidence that they didn't file with their initial petition. So I think that he was right on the order. So are we just chasing our tails at the end of the day? You're going to go down to state court. You're going to prove more than $5 million. You're going to be up here again on a removal order, aren't we? No, I don't. I do not. At some point. I do not want to be here again. You don't like federal court? As somebody who does class actions, I wouldn't make those allegations unless I believe them to be absolutely true. And there is, you know, there's nothing in the record. I do not believe the policy that we're challenging was not a full four-year policy. I mean, so there's a whole lot of other things we could have done if we wanted CAFA threshold discovery, which some district court judges allow. But we didn't get there. There was no need. But those allegations are in good faith. I do not expect to ever be back in this court on this case. As much as I would like to be back. Further questions? Any questions? House of Baird. Just a few things briefly. Judge Burrell did not consider the same thing on the second remand. That's clear. It's a different pleading at that point. It's a different standard of proof. It's different case law. He thoroughly cited Vaudermilk. He was clear in the second remand order, in fact, that he specifically didn't consider the things that he considered. He was considering the second time when he didn't consider the first time. The burden here is kind of flipped in that plaintiffs are saying there's no authority. Plaintiffs are essentially saying that we should have moved to stay or that we should have consolidated or that we should have done something different because of the second remand order. But there's no authority for that. The court has asked me for authority on the general rules of, you know, appellate jurisdiction. And I've tried to provide what I can. Certainly be willing to provide more in an additional briefing. But there's no authority for the proposition that plaintiffs are arguing that we had to do something different here. So let's turn this around a little bit. Let's say that on the second time up, Judge Burrell said, yeah, I got it wrong. I have jurisdiction. That would move the case, this appeal, right? Say that one more time. If Judge Burrell had accepted the second removal and denied the motion to remand and said I now have evidence in front of me that indicates I have jurisdiction, that would move this appeal, right? It would move this appeal because there would be no effective relief that this court could provide. True. So why doesn't his remand order move this and make us say, all right, we've got to take a, we have to look at his new order, his new evidence? Because the appellate court still can provide effective relief. If the appellate court sends it back to Burrell and says the judge. Judge Burrell. Judge Burrell, I'm sorry. Yeah. If the appellate court sends it back to Judge Burrell and says you were wrong, you should have considered the First Amendment complaint on the first removal, he'll have to consider the first remand order again. And what we would propose is that you just tell him that the mountain controversy has been met. Once that's done, then everything else after that is superseded. And let me, I just wanted to provide one more case for the court. The, actually the Tenth Circuit has addressed the issue of whether appellate court jurisdiction under 28 U.S.C. 1453 under this Catholic appeal, whether it is conditioned on whether a district court stays a remand order. Tenth Circuit has addressed that. That's BP America versus Oklahoma, 613 F3D 1029. The clerk will have a sheet you can give the additions to afterwards. Okay. In that case, the Tenth Circuit addressed this very issue and said whether or not it stays issued in the district court doesn't affect our appellate jurisdiction under 28 U.S.C. 1453. And the same is true here. It didn't matter what happened in the district court after, this court can provide effective relief by remanding the case and instructing Judge Burrell to deny the motion to remand based on the fact that it's clear in this case, and this is what I didn't get to earlier, it's clear in this case that the amount of controversies met, if the First Amendment complaint is a judicial admission, and if it had to be considered, then it's conclusive. Because if you take the two- to five-hour allegation and you take the admission, the two- to five-hour admission, and you apply that to the allegations of their complaint, which is that each class member was injured, that they were typical, that the injuries were typical, you're clearly over the $5 million threshold, and therefore the remand order should be reversed. Thank you, counsel. The case is currently submitted for decision. We'll be in recess for five minutes. We'll come back and take some questions. I want to assure counsel we're not going to ask about your case. We're not going to let them. If they beg us to talk about your case, we're not going to. So we'll be back. All rise.
judges: Restani, Thomas, Ikuta